Patrick J. Geile
Bar No. 6975
**FOLEY FREEMAN, PLLC**
**953 S. Industry Way**
P.O. Box 10
Meridian, ID 83680
Phone: (208) 888-9111
FAX: (208) 888-5130
*pgeile@foleyfreeman.com*

**Attorney for MetLife Investment Management, LLC, in its capacity as the investment manager for Metropolitan Life Insurance Company**

### UNITED STATES BANKRUPTCY COURT

### DISTRICT OF IDAHO

| | |
|---|---|
| **In re:** | **Case No. 20-40734-JMM** |
| **DEWIT DAIRY,** | **Chapter 11** |
| Debtor. | **MOTION TO APPOINT CHAPTER 11 TRUSTEE** |

COMES NOW, Metropolitan Life Insurance Company, by its investment manager MetLife Investment Management, LLC (collectively, "MetLife"), acting through its counsel of record, Patrick J. Geile of Foley Freeman, PLLC, and hereby submits this *Motion to Appoint Chapter 11 Trustee* (the "Motion"). In support of the Motion, MetLife states as follows:

#### Introduction

1.      The Debtor has demonstrated no hope of a reorganization, allowed its most valuable asset to rapidly deteriorate, ignored health and safety concerns, and expended its few remaining assets to protect insiders. Therefore, this case is squarely within the parameters of 11 U.S.C. §§ 1104(a)(1)-(2) for the appointment of a Chapter 11 trustee "for cause" and such appointment is in the "best interest of creditors." 11 U.S.C. §§ 1104(a)(1)-(2). The Court should appoint an independent and experienced Chapter 11 trustee because: (I) the Debtor continues to

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 1**

misuse its assets in contravention of the Bankruptcy Code; and (II) the Debtor continues to permit its most valuable asset to rapidly diminish in value and condition.

      2.    The Debtor's continued possession of its financial affairs and business continues to harm the Debtor's creditors, including MetLife.  First, the Debtor has continuously expended scarce estate assets to protects its principals and interested parties rather than its creditors.  Second, the Debtor has failed to account for the cash rent it collects from the leases of the Property (as defined below) or provide accurate accounting to MetLife.  Third, the Debtor intentionally expended extraordinary resources on the eve of bankruptcy making it unlikely it would ever pursue those actions for the benefit of its unpaid creditors.

      3.    Furthermore, the Debtor continues to permit its most valuable asset to rapidly diminish in value and condition.  Even though the sole hope of the creditors for a meaningful recovery lies in the sale of the Property, the Debtor continues to neglect the Property and has failed to take any material actions to liquidate the Property for the benefit of creditors.  The Debtor purports to have intended to liquidate its assets prior to the Petition Date (defined below).  Yet, this case has been pending for three (3) month, and, over this extended time, no verifiable action or offer has been made with respect to the liquidation of the Property.  Moreover, the Debtor has failed to comply with state requirements with respect to, *inter alia*, the accumulation of manure and significant disrepair of lagoons and waste ponds, causing a health and safety hazard at the Property.

      4.    The Court should order the appointment of a Chapter 11 trustee because cause exists, and the appointment of an experienced, independent Chapter 11 trustee is in the best interest of creditors.

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 2**

## Background

5.      Dewit Dairy (the "Debtor") is an Idaho general partnership that historically operated a dairy at 2011 Bob Barton Highway in Wendell, Idaho (the "Property").  The Debtor ceased its operations in early 2020 and purportedly undertook steps to achieve an out-of-court liquidation of its assets.  Docket No. 5, at ¶ 4.  On September 18, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the sole intention of liquidating its remaining assets.  Docket No. 1.  The Debtor has no intention to restructure or reorganize its affairs.  Docket No. 5, at ¶ 7.

6.      Before the Petition Date, on or about July 3, 2013, the Debtor, together with Anthony Neil Dewit, Julie Renee Dewit, Tracy Jean Wilhelm and Robert Earl Wilhelm, (collectively the "Borrowers") made, executed and delivered to MetLife that certain promissory note number **6455 in the original amount of six million dollars. Thereafter, on or about March 17, 2017, the Borrowers executed and delivered to MetLife that certain promissory note number **8160 in the amount of one million dollars (collectively, with promissory note number **6455, the "Notes").

7.      The Notes are secured by the Debtor's real property, including the Property, and certain personal property and proceeds thereof (collectively the "Collateral") pursuant to the following documents:

> a.      Mortgage, Assignment of Rents, Security Agreement and Fixture Filing dated as of March 17, 2017 and filed for record with the Gooding County Recorder as Instrument #257811 on March 22, 2017;
>
> b.      Assignment of Bonuses, Rental and Royalties—Oil, Gas and Minerals dated as of July 3, 2013 and recorded with the Gooding County Recorder on July 3, 2013 as Instrument #245353;
>
> c.      Pledge Agreement dated July 3, 2013;
>
> d.      Producers Assignment dated July 3,  2013; and

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 3**

e.    Assignment of Certain Share Certificates dated July 3, 2013.

All the above documents are collectively referred to as the "Collateral Documents."  MetLife's
security interest in the Debtor's personal property is properly perfected by the filing of financing
statements with the Idaho Secretary of State on August 29, 2013 as filing number B2013-1128608-6 and on March 23, 2017 as filing number B2017-1190748-0, all as thereafter
continued.  MetLife has a first lien in the real property, including the Property, and personal
property described in the Collateral Documents.

8.    The Debtor was already in default on both Notes before the Petition Date.  As of
the Petition Date, the total amount due and owing on the Notes was:

| Note | Principal | Interest | Late Fees | 9/18/20 Total |
|------|-----------|----------|-----------|---------------|
| 6455 | $3,651,946.85 | $14,429.13 | $57.72 | $3,666,433.70 |
| 8160 | $827,504.57 | $3,120.13 | $12.48 | $830,637.18 |
|      |           |          | **TOTAL** | **$4,497,070.88** |

Post-petition interest, late charges, costs and attorneys' fees continue to accrue on the Notes
pursuant to 11 U.S.C. § 506(b).

9.    On the Petition Date, the Debtor filed its cash collateral motion.  A hearing was
held on September 25, 2020, and, on October 7, 2020, the Court granted the motion for interim
use, effective as of September 25, 2020 [Docket No.  37].  The cash collateral motion and initial
order failed to disclose what property the Debtor would seek to use on a final basis.  The Debtor
supplemented the motion on September 24, 2020, with a breakdown of what property would be
used and which creditor it believed had an interest in that property.  The final cash collateral
order did not provide any adequate protection to MetLife for the continued use of the Property or
any of its personal property.

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 4**

10.     The Debtor's initial bankruptcy schedules did not list any account receivables or rent proceeds.  Moreover, the Debtor's initial schedule G did not list any executory contracts that related to rental payments or possible source of rental income. The Debtor has since amended its schedules to disclose certain farm leases and certain lease of rentals.  There are two farms leases on the amended schedule G that are paid twice a year: (1) a lease with Evers Brothers Farm LLC for approximately 164 acres of the Property (the "Evers Lease"); and (2) a lease with Elmer Johnson (the "Johnson Lease") for approximately 185 acres of the Property.

11.     The Debtor is purportedly expecting a payment of $24,860.00 from the Evers Lease on November 20, 2020.  The Debtor is further expecting a payment of $27,750.00 to be paid from Johnson Lease on November 20, 2020.  No record has been provided as to the payment or receipt of these leases.  During Tony Dewit's 2004 exam, conducted on December 1, 2020, Mr. Dewit testified that he believed the farm rents had been paid and deposited into the Debtor in Possession accounts. (Declaration of Patrick Geile paragraph 2, 2004 Exam of Tony Dewit p. 25-26.)  The reports provided by the Debtor in this case do not show the deposit of either rent check.  (Declaration of Patrick Geile paragraph 3, Debtor weekly reports.)

12.     Additionally, Schedule G still does not disclose the amount each residential lease tenant is paying, nor do the weekly reports show the deposit of income from those rentals. MetLife has not granted permission for the Debtor to use those rent proceeds, nor has the court granted permission to use those rent proceeds.  Tony Dewit testified that he receives residential rent funds from his tenants in the amount of $1,800.00 per month but does not deposit those funds into the DIP account.  (Declaration of Patrick Geile paragraph 2, 2004 Exam of Tony Dewit p. 22-23, 28, 37-38.)  There is no accounting of these funds anywhere in the Debtor's monthly or weekly operating reports.

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 5**

13.     To the further detriment of MetLife, the Debtor has not paid or offered to pay MetLife adequate protection for the use of the farm lease proceeds, residential lease proceeds, or any future proceeds paid from these leases.

14.     The Debtor's lack of disclosure and MetLife's concerns over the administration of the Property caused MetLife to engage an inspector, Ken Nofziger, to conduct diligence as to the condition of its Collateral.  The Debtor has permitted Mr. Nofziger access to the Property.  While Mr. Nofziger has yet to provide a final report or valuation, his review and examination of the Property showed significant neglect and disrepair with the Debtor's dairy facilities and Property, all in violation of regulatory requirements.  The Debtor was previously served with violations of state regulatory requirements related to the operation and safety at the Property.  The known, yet not remediated violations include, without limitation, years of accumulation of manure, unsafe lagoons, and waste ponds that cause contamination and harm to the Property.  All these issues continue damage the Property and further diminish the value of MetLife's Collateral.

15.     The poor condition of the Property is evidenced by the photographs reviewed during the 2004 exam.  Mr. Nofziger took many photographs on October 1, 2020 that Mr. Dewit verified during his exam.  (Declaration of Patrick Geile paragraph 2, 2004 Exam of Tony Dewit p. 73-91, Exhibit 10-4.)  The photographs show at least a year's accumulation of manure, piles of garbage and other refuse, broken equipment, damaged concrete, tilted silos, damaged fences, buildings that should be demolished, and other images evidencing years of little-to-no maintenance of the Property. While the Property has continued to deteriorate, MetLife's claim only accumulates, to the detriment of all creditors.

16.     On October 5, 2020, MetLife requested that the Debtor provide all documentation of licensing and permitting associated with the Property and dairy operation to determine the current value of its Collateral.  After multiple requests, the Debtor failed to provide any of the

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 6**

requested documentation, raising additional red flags. Only after the 2004 exam did the Debtor provide limited documentation of the brochure to market the property and the documents associated with the milk cooperative. Tony Dewit testified that he did have CAFCO report, yield information, and the waste management operating plans as they related to the lagoons, but those have yet to be provided to MetLife. (Declaration of Patrick Geile paragraph 2, 2004 Exam of Tony Dewit p. 91-94.)

17.    The Property is the Debtor's sole remaining asset of significant value and only chance for a material distribution to creditors. *See, e.g.,* Docket No. 79, at p. 2 (Total Assets Value: $11,332,278; Real Property Value: $10,500,000). And yet, not only has the Debtor continued to neglect the Property, the Debtor also has failed to make any significant progress towards selling the Property. The Debtor purportedly received an oral offer of $10.5 million for the Property, but nothing came to fruition with that offer.

18.    Despite having retained a qualified real estate agent, the Debtor has given no indication of what will be done to market and sell the Debtor's dairy operations. This blackhole into the sale process only harms the creditors. Given the lack of ongoing operations, while significant payments are still being made to employees (including the insiders), and the continued diminution in value of a shuttered dairy, the Debtor should immediately move to enter sale procedures, outlining specific milestones and qualifications for bids of the Property, culminating in an auction as soon as reasonably possible. An auction, after entry of sale procedures, will avoid the continued accumulation of expenses related to maintaining the Property and preserving equipment, not to mention the real estate taxes, interest and the administrative costs of this Chapter 11 case that continue to accrue.

19.    Tony Dewit has repeatedly expressed his unwillingness to disclose prospective purchasers and the potential proceeds that a sale would provide to the estate. (Declaration of

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 7**

Patrick Geile paragraph 2, 2004 Exam of Tony Dewit p. 42-43.)  It is unclear why a debtor-in-possession would resist the assistance of its creditors in achieving a sale of estate assets.  Despite lacking any experience in buying or selling dairies, Mr. Dewit seems to believe that the best approach for selling the Property is to limit everyone's knowledge of potentially interested parties.   Mr. Dewit can provide no support for his continued concealment of prospective purchasers.  This lack of transparency only creates confusion and delay.

20.    The continued delay of a sale will directly result in fewer funds available to pay the general unsecured creditors.   The secured and priority claims filed to date include: a judgment lien in the amount of $176,457.00 (Claim 2), a priority tax liability in the amount of $601,654.01 (Claim 7), MetLife's secured claim of at least $4,497,070.88, plus KeyBank's expanding secured claim.  Pursuant to KeyBank's stipulation with the Debtor, KeyBank will have secured positions in the amounts of $300,000.00 plus an amount of up to 150% of the cash collateral used of approximately $100,000.00, and a third position lien of $172,500.00, for a total of $572,500.00.   Additionally, all the secured claims continue to accumulate interest to the detriment of unsecured creditors.  Therefore, before any general unsecured creditors are paid, there would need to be over six million dollars in net sale proceeds.

21.    Yet, despite the seemingly exigent circumstances attendant with the Property, the only material actions the Debtor has taken were to benefit the Debtor's principals.  Since the filing of the Petition Date, the Debtor has filed two adversary proceedings *against* creditors to preclude the creditors' actions to recover funds against the principals.  These actions were not for the benefit of the creditors or the estate – this is a non-operating, liquidating Chapter 11 case – they were only to benefit the insiders.  To that end, the Debtor undertook extensive litigation so far, including depositions and hearing on a temporary restraining order, to the detriment of its creditors.

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 8**

22.     Moreover, just before filing the Chapter 11 case, the Debtor paid more than $600,000 to certain creditors while leaving the remaining creditors empty-handed.  <u>Docket No. 62</u>, at p. 6.  It is unlikely that the Debtor, who chose which creditors to pay, will pursue these actions against creditors during the bankruptcy case when its focus has been solely on the insiders.[1]  There is a direct conflict of interest when a debtor-in-possession chooses to spend thousands of scarce dollars on the protection of insiders over the protection of its creditors who are owed millions of dollars.

23.     The Debtor also has demonstrated mismanagement with respect to its payroll taxes, continuing a trend that started before the Petition Date.  Mr. Dewit testified that the Debtor is accumulating post-petition payroll taxes that have not been paid.  (Declaration of Patrick Geile paragraph 2, 2004 Exam of Tony Dewit p. 22.)  These unpaid taxes will be considered administrative expenses and further diminish the funds available to be paid to general unsecured creditors.  This post-petition unpaid tax liability is in addition to significant prepetition tax liability exceeding $500,000.00.

24.     Mr. Dewit testified that he is incurring post-petition liabilities for vendors as well. He testified that he is purchasing fuel on an open account and has an outstanding $12,000.00 bill for clay that was incurred post-petition.  (Declaration of Patrick Geile paragraph 2, 2004 Exam of Tony Dewit p. 35-36.)

## <u>Legal Standard</u>

25.     MetLife moves this court for appointment of a trustee pursuant to 11 U.S.C 1104(a), which states in part:

---

[1] It is unclear at this time whether a preference campaign will be necessary given the scheduled value of the Property.  If the Property cannot be sold for more than the outstanding liabilities, the recovery of preferences appears to be the unsecured creditors' sole hope for a full recovery.

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 9**

a)  At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee—

(1)  for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2)  if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 USC § 1104(a).

26.     Pursuant to section 1104 of the Bankruptcy Code, "at any time after the commencement of the case but before confirmation of a plan, on request of a party in interest . . . and after notice and a hearing, the court shall order the appointment of a trustee - (1) for cause . . .; or (2) if such appointment is in the best interests of creditors." *See* 11 U.S.C. § 1104(a). *Lowenschuss v. Selnick (In re Lowenschuss)*, 171 F.3d 673 (9th Cir. 1998).  Either one of these two independent grounds is sufficient to justify granting a motion to appoint a Chapter 11 trustee. *Id.*

27.     The Court has the discretionary authority to determine whether cause exists for the appointment of a trustee under § 1104(a)(1). *In re Sharon Steel Corp.*, 871 F.2d 1217, 1226 (3rd Cir. 1989).  Considerations include the materiality of any misconduct, the debtor-in-possession's evenhandedness or lack thereof in dealings with insiders and affiliated entities in relation to other creditors, the existence of pre-petition voidable preferences or fraudulent conveyances, whether any conflicts of interest on the part of the debtor-in-possession are interfering with its ability to fulfill its fiduciary duties, and whether there has been self-dealing or squandering of estate assets.  *In re Veblen West Dairy LLP*, 434 B.R. 550, 553 (Bankr. D. S.D. 2010)

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 10**

28.     "A chapter 11 debtor's desire to remain in possession of the property of the bankruptcy estate and in control of its reorganization is certainly an important interest, but that interest cannot reasonably be said to be any more important than a chapter 7 debtor's interest in receiving a discharge of all his debts. The Court is thus persuaded a party seeking the appointment of a chapter 11 trustee bears the burden of persuasion by the preponderance of the evidence, not by clear and convincing evidence." *Veblen West Dairy,* 434 B.R. at 555-56.

29.     When the "present prospects for a successful rehabilitation of the debtor are extremely remote," the appointment of a Chapter 11 trustee is appropriate when it is clear "(a) that the continuation of current management will result in serious potential conflicts of interest; (b) that it would be more economical, beneficial and advantageous to the creditors and equity security holders to have current management replaced by a Chapter 11 trustee; and (c) that the interests of the creditors . . . would be better served by the appointment of an experienced and independent Chapter 11 trustee, whose sole motivation will be to realize the maximum amount of monies possible from a liquidation of [the Debtor's] assets." *In re L. S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D. West Va. 1980).

## Argument

30.     The Court should appoint an independent and experienced Chapter 11 trustee because: (I) the Debtor continues to misuse its assets in contravention of the Bankruptcy Code; and (II) the Debtor continues to permit its most valuable asset to rapidly diminish.

## I.     The Debtor Continues to Misuse its Assets in Contravention of the Bankruptcy Code.

31.     The Court should order the appointment of a Chapter 11 trustee because the Debtor continues to misuse its assets in contravention of the Bankruptcy Code.  First, the Debtor has continuously expended scarce estate assets to protects its principals and interested parties

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 11**

rather than its creditors.  Second, the Debtor has failed to account for the cash rent it collects from the leases of the Property (as defined below) or provide accurate accounting.  Finally, the Debtor intentionally expended extraordinary resources on the eve of bankruptcy making it unlikely it would ever pursue those actions for the benefit of creditors.

      A.      **The Estate has been administered solely for the principals' benefit.**

32.      The Court should appoint a Chapter 11 trustee because the Debtor is administering the Chapter 11 case solely for the benefit of insiders and interested parties.  The debtor-in-possession is a fiduciary to its creditors; however, the Debtor's actions in this case belie that duty.  Rather than expeditiously liquidate its assets, or dedicate its time and resources to the liquidation, the Debtor has expended considerable time and assets for the purpose of protecting its insiders and interested parties.

33.      From the outset, despite undertaking an out-of-court liquidation for months, the Debtor almost immediately sought an injunction for the benefit of its insiders.  Docket No. 12. The purported basis for the injunction was, *inter alia*, to prepare bankruptcy reporting requirements, prepare for court hearings, and interact with legal counsel.  *Id.* at ¶ 12.  These purported grounds for an injunction are standard requirements of a debtor-in-possession and not substantive in nature to protect the administration of a Chapter 11 case.  Instead, from the outset of the case, the Debtor spent valuable time and resources to protect the insiders in two separate adversary proceedings.

34.      Additionally, none of the adversary proceedings provide *any* specific facts or details as to the benefit of providing an injunction for all three general partners, let alone the benefit provided by any single partner.  The Debtor continues to pay $6,000 per month to the insiders, plus an additional $17,000 per month in salary for employees for a non-operating Debtor that is being poorly maintained.  This case has been pending for more than three months

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 12**

and nothing in the record or in MetLife's investigation demonstrates any benefit for the estate or its creditors from management's continued control of the Debtor.  This case is a liquidation and not a personal shield for the Debtor's principals and their interested parties.

35.     The appointment of an independent third-party Chapter 11 trustee would streamline the efficient of this Chapter 11 case.  A Chapter 11 trustee would remove all biases and distractions from the administration of the Chapter 11 case.  The trustee would ensure that the case is efficiently run and pursue from the outset a streamlined sale process and remediation of all outstanding Property issues to *enhance* the value for creditors.  Additionally, the Chapter 11 trustee would take an objective review of the Debtor's monthly expenses and distinguish between those expenses that detract from creditors' recovery and those that are meaningful to the estate.  Meanwhile, with a third party administering the bankruptcy case, the general partners would be able to focus on their individual defenses and not use valuable estate resources for their own benefit.

**B.      The Debtor has failed to account for rental income.**

36.     The appointment of a Chapter 11 trustee is appropriate because the Debtor has failed to account for rental income that remains MetLife's Collateral.  The Debtor's initial bankruptcy filing did not list any farm leases or residential leases.  Docket No. 1, at p, 31.  Only two (2) weeks after the 341(a) meeting of creditors did the Debtor schedule the Evers Lease, Johnson Lease, and four other leases, all related to the Property.  Even though it collects rents from the tenants, the Debtor has not adequately accounted for that rental income nor reported such income to MetLife.

37.     According to the Debtor's cash collateral supplement [Docket No. 24], the Debtor expects to collect $50,000 in rent from the farm leases.  Purportedly, the Debtor will collect $24,860.00 from the Evers Lease and $27,750.00 from the Johnson Lease.  These rental

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 13**

payments are clearly within the parameters of the Collateral Documents; however, MetLife has only learned about them since the filing of the bankruptcy case. The Debtor has failed to provide MetLife with appropriate records or accounting related to the rents previously collected and/or specifics related to the terms of such leases. MetLife also is not being adequately protected for the continued use of its cash collateral.

38.    The Debtor has not accounted for the four residential leases in its cash collateral budget or elsewhere. Upon information and belief, MetLife understands that the residential leases are paid in cash to the Debtor. The Debtor has not disclosed to MetLife (or any other party) how or where the proceeds from the leases were used in the administration of the bankruptcy estate or disseminated outside the bankruptcy case. The absolute lack of disclosure with respect to the leases and income demonstrated the need for the appointment of a Chapter 11 trustee so that the Chapter 11 case can be administered transparently and solely for the benefit of the creditors and bankruptcy estate.

**C.    The Debtor intentionally expended extraordinary resources on the eve of bankruptcy.**

39.    The appointment of a Chapter 11 trustee is required because the Debtor intentionally expended extraordinary resources on the eve of bankruptcy to the prejudice of existing creditors. The Bankruptcy Code specifically demarcates payments made to creditors in the 90-day period prior to the bankruptcy filing as potentially preferential payments. *See* 11 U.S.C. § 547. In the one month before the Petition Date, the Debtor paid more than $600,000 to creditors while leaving the remaining creditors, including MetLife, with the burden and uncertainty of financing the bankruptcy case.

40.    The Debtor has more than $3.1 million in general unsecured claims. These claims are unlikely to be paid in full based on the Debtor's assets and liabilities. *See, e.g.,* <u>Docket No.</u>

79.   On the eve of bankruptcy, the Debtor expended extraordinary estate assets to pay certain creditors over others, presumably those creditors where the payment would benefit insiders.  The Debtor's expenditure of more than $600,000 immediately before the Petition Date shifted the burden of financing this bankruptcy case from the Debtor, which apparently had the capital but expended it before the filing, to its creditors.  The Debtor made a concerted effort to transfer these funds and leave the remaining creditors left to collect, likely on a *pro rata* basis, through the bankruptcy case.

41.    While the Debtor purposefully made the extraordinary payments on the eve of bankruptcy, the Debtor has not indicated that it will seek to recover those same payments.  The Debtor's statement of financial affairs provides that the insiders of the Debtor did not receive *any* payments within the one-year period before the Petition Date.  Docket No. 1, at 35.  This is highly suspect.  Similarly, it is unlikely that the general unsecured creditors will recover payment in full without a preference campaign to collect the preferential payments.  A Chapter 11 trustee should be appointed to recover the preferential payments and, equally important, investigate whether the insiders of the company received any transfers within the one-year period before the Petition Date.

## II.    **The Debtor Continues to Permit its Most Valuable Asset to Rapidly Diminish**.

42.    The Court should appoint a Chapter 11 trustee because the Debtor continues to permit the Property to diminish in value and condition.  The sole hope of the creditors for a meaningful recovery lies in the sale of the Property.  The Debtor, however, continues to neglect the Property and has not taken any material actions to liquidate the Property for the benefit of creditors.  While the Debtor has hired an experienced broker to market the Property, nothing has come to fruition with this process.  Each day the Property remains on the market, the value of the

Property continues to decline based on the carrying costs, including interest due to MetLife in the amount of $18,000 per month, plus the Property deteriorates in condition.

43.     No progress has been made in the sale process, and the Debtor has demonstrated no interest in moving the process forward. The Debtor appears content to continue to diminish the estate to the tune of approximately $25,000 per month in payroll, not counting other expenditures, while a sale process meanders along. Seemingly, this delay allows the Debtor to continue to collect the cash rental payments from the residential leases.

44.     A Chapter 11 trustee should be appointed to expedite the sale process to implement sale procedures culminating in an auction. A Chapter 11 trustee would ensure that the sale process is focused on maximizing the return to creditors in the most expeditious manner possible. The Property is the creditors' sole hope in obtaining a meaningful recovery in this case and, because no reorganization is sought or possible, there is no benefit to having the Debtor remain in possession or control the sale process.

45.     The condition of the Property, and thereby its value, has continued to deteriorate while the Debtor has remained in possession. The Debtor has been served with multiple state compliance requirements and failed to bring the Property up to compliance. These requirements include, without limitation, the accumulation of mountains of manure at the Property and significant disrepair of lagoons and waste ponds. These violations constitute environmental and safety hazards at the Property and, not surprisingly, greatly diminish the value and attraction of the Property to buyers. A Chapter 11 trustee should be appointed to focus immediately on the remediation of the Debtor-created hazards at the Property and restore the value of the Property for the benefit of the creditors.

46.    The Court should appoint a Chapter 11 trustee because the Debtor has failed for more than three months to take any meaningful steps to maintain or liquidate the Property for the interest of creditors.

### III.    The Appointment of an Experienced and Independent Trustee Is in the Best Interests of the Unsecured Creditors.

47.    When the "present prospects for a successful rehabilitation of the debtor are extremely remote," the appointment of a Chapter 11 trustee is appropriate "when ……. (c) that the interests of the creditors . . . would be better served by the appointment of an experienced and independent Chapter 11 trustee, whose sole motivation will be to realize the maximum amount of monies possible from a liquidation of [the Debtor's] assets." *In re L. S. Good & Co.*, 8 B.R. 312, 315 (Bankr. N.D. West Va. 1980).

48.    The Debtor's continued delay in the sale is most harming the unsecured creditors. Because secured claims continue to erode the funds available for unsecured creditors, each day lost results in greater harm to unsecured creditors.

49.    Mr. Dewit's approach to the sale is not benefitting all creditors.  Mr. Dewit believes that, even though he has no experience in buying or selling dairy property, he should control the sale process.  His approach has been more focused on the concealment of interest in the Property rather than actively seeking out potential buyers.  It appears so far that the only marketing materials for a multimillion-dollar property is a brochure with evidence of little to no distribution.

50.    An experienced and independent Chapter 11 trustee is better suited to maximize the return to unsecured creditors by aggressively managing the sale of the property.  A Chapter 11 trustee would benefit the unsecured creditors by getting a sale motion properly before the

Court in timely fashion. The quicker the property is improved to the point it can be sold, the more funds will be paid to the unsecured creditors.

## IV. Robert Marcus Should be appointed as the Chapter 11 Trustee.

51.     MetLife proposes to appoint Robert Marcus to act as a Chapter 11 liquidating trustee.  Mr. Marcus has significant experience as a fiduciary in these types of cases. He is a licensed attorney in the State of Illinois and admitted to practice in Federal District Courts and Bankruptcy Courts throughout the country. His practice focuses on agribusiness, including the Perishable Agricultural Commodities Act ("PACA"), and representing agribusiness suppliers, farmers, brokers, shippers, lenders, unsecured creditors, corporate debtors and others in numerous matters around the country.

52.     He has served as PACA trustee and receiver, federal and state court appointed receiver and trustee, chief restructuring officer, and as a post-confirmation liquidating trustee. Significant matters where he has rendered services include East Coast Brokers & Inc. (creditor's attorney), Joe Caputo & Son's Inc., et al. (PACA trustee, receiver, interim COO, asset sale), Grainger Farms, Inc./GJJ Farms, Inc. (auctioneer attorney, Chief Restructuring Officer of Farming Operations), Michael's Market, Inc. et al. (PACA Trustee, interim operations manager, new company transition), J&S Produce, Inc. (receivables collections, third party disgorgement, PACA), Eclipse Berry Farms, LLC (Chief Restructuring Officer), Las Uvas Valley Dairies (Liquidating Trustee), Victor Produce of New Mexico, Inc. (Receiver), and Johnson Living Trust (Receiver). In the most recent matters, he has been responsible for a 10,000± head dairy, over 2,200± acres of pecan orchards, and 400± acres of farmland.

53.     He has experience in accounting, management and maintenance operations.  As such, he has established systems in place to timely and efficiently handle accounting, management and maintenance operations and can handle the operational duties and reporting

requirements that come with being a court-appointed trustee.  He is fully capable of managing and overseeing the operations of the Property and liquidation of remaining assets.  As the court-appointed trustee, he would be accountable to the Court in its responsibilities regarding this trustee and has experience filing written reports and accountings with courts on a regular monthly basis and have prepared final accountings for court review and approval.

54.    Mr. Marcus would be paid pursuant to court order an hourly basis plus reimbursement of reasonable out-of-pocket expenses at the following current rates: (i) for trustee, $450 per hour; (ii) for professional and accounting staff, $295 to $450 per hour; and (iii) for support staff, $115 per hour.

## Conclusion

There is no prospect for a successful rehabilitation of the Debtor and the appointment of a Chapter 11 trustee is appropriate because (a) the continuation of current management would result in serious conflicts of interest; (b) it would be more economical, beneficial and advantageous to the creditors and equity security holders to have current management replaced by a Chapter 11 trustee; and (c) the interests of the creditors would be better served by the appointment of an experienced and independent Chapter 11 trustee, whose sole motivation will be to realize the maximum amount of proceeds available from a liquidation of the Property.

DATED this 15th day of December, 2020.

FOLEY FREEMAN, PLLC


/s/ Patrick J. Geile
Patrick J. Geile
Attorneys for MetLife

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 19**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of December, 2020, I caused to be served a true and correct copy of the foregoing document by the method indicated below, and addressed to the following:

| | | |
|---|---|---|
| Office of the U.S. Trustee<br>Washington Group Central Plaza<br>720 Park Blvd., Ste. 220<br>Boise, ID 83712 | X | CM/ECF Notice |
| Matthew T. Christensen<br>Chad Moody<br>Angstman Johnson<br>199 N. Capitol Blvd, Ste 200<br>Boise, ID 83702 | X | CM/ECF Notice |
| Andrew S. Jorgensen<br>Office of the U.S. Trustee<br>720 Park Blvd, Ste 220<br>Boise, ID 83712 | X | CM/ECF Notice |
| David A. Heida<br>White, Peterson, Gigray & Nichols P.A.<br>5700 E. Franklin Rd Suite 200<br>Nampa, ID 83687 | X | CM/ECF Notice |
| Sheila R. Schwager<br>Hawley Troxell Ennis & Hawley LLP<br>PO BOX 1617<br>Boise, ID 83701-1617 | X | CM/ECF Notice |
| Amber Nicole Dina<br>Givens Pursley LLP<br>601 W. Bannock Street<br>Boise, ID 83705<br>(Official Committee of Unsecured Creditors) | X | CM/ECF Notice |
| David W. Gadd<br>Worst, Fitzgerald & Stover, P.L.L.C.<br>905 Shoshone St. N.<br>P.O. Box 1428<br>Twin Falls, ID 83303-1428 | X | CM/ECF Notice |
| Kelly Greene McConnell<br>POB 2720<br>Boise, ID 83701-2720<br>(208) 388-1200 | X | CM/ECF Notice |

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 20**

James C Meservy                          _X_      CM/ECF Notice
Williams, Meservy & Larsen, LLP
POB 168
Jerome, ID 83338

Dewit Dairy                              _X_      U.S. Mail
2011 Bob Barton Hwy
Wendell, ID 83355

                                         _/s/ Patrick J. Geile_____
                                         Patrick J. Geile

**MOTION TO APPOINT CHAPTER 11 TRUSTEE – 21**